UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

---

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| AFFINITY HEALTH CARE, | ) | JOINTLY ADMINISTERED UNDER |
| MANAGEMENT, INC., ET AL.,[1] | ) | CASE NO. 08-22175 |
| | ) | |
| DEBTORS. | ) | |

---

| | | |
|---|---|---|
| | ) | |
| OFFICIAL COMMITTEE OF | ) | ADV. PRO. NO. 10-02187 |
| UNSECURED CREDITORS OF | ) | |
| AFFINITY HEALTH CARE | ) | |
| MANAGEMENT, INC., HEALTH | ) | RE: ADV. ECF NOS. 52 & 74 |
| CARE INVESTORS, INC., HEALTH | ) | |
| CARE ALLIANCE, INC., HEALTH | ) | |
| CARE ASSURANCE, LLC., AND | ) | |
| HEALTH CARE RELIANCE, LLC., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| v. | ) | |
| | ) | |
| MURRAY WELLNER, M.D., and | ) | |
| MASSACHUSETTS MUTUAL LIFE | ) | |
| INSURANCE COMPANY (MASS | ) | |
| MUTUAL), a/k/a MASS MUTUAL | ) | |
| FINANCIAL GROUP, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

---

APPEARANCES:

Mark I. Fishman, Esq.                    Attorneys for Plaintiffs
Lucas Bennett Rocklin, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street
New Haven, Connecticut 06510

---

[1] The Debtors herein consist of Affinity Health Care Management, Inc., Case No. 08-22175, Health Care Investors, Inc., Case No. 08-22177, Health Care Alliance, Inc., Case No. 08-22178, Health Care Assurance, LLC, Case No. 08-22179 and Health Care Reliance, LLC, Case No. 08-22180, (collectively, hereinafter, the "Debtors").

Jeffrey Hellman, Esq.
Law Offices of Jeffrey Hellman, LLC.
195 Church Street
10th Floor
New Haven, CT 06510

and

John J. O'Neil, Jr., Esq.
Francis, O'Neil & Del Piano, LLC.
255 Main Street
Hartford, CT 06106

Joshua W. Cohen, Esq.
Day Pitney, LLP.
One Audubon Street
New Haven, Connecticut 06511

Attorneys for Defendant,
Murray Wellner, M.D.

Attorney for  Defendant,
 Massachusetts Mutual
Life Insurance Company
(Mass Mutual), a/k/a Mass
Mutual and a/k/a Mass Mutual
Financial Group

_____

## MEMORANDUM OF DECISION
## GRANTING PLAINTIFFS' MOTION FOR [PARTIAL] SUMMARY JUDGMENT ON THE FOURTH CAUSE OF ACTION OF THE PLAINTIFFS' COMPLAINT

ALBERT S. DABROWSKI, Chief United States Bankruptcy Judge

## I. INTRODUCTION

Before the Court is an adversary proceeding captioned *Complaint to Avoid and Recover Certain Payments Made to Defendants and to Obtain Related Relief* (hereinafter, the "Complaint"), Adv. ECF No. 1, in which the Official Committee of Unsecured Creditors (hereinafter, the "Committee") duly appointed by the United States Trustee on or about November 4, 2008, together with the reorganized Debtors, seek to avoid and recover pursuant to 11 U.S.C. §§ 544, 547(b), 548, and 550, alleged fraudulent and preferential transfers from one or more of the Debtors to Murray Wellner, M.D. (hereinafter, "Wellner" or the "Defendant") and/or Massachusetts Mutual Life Insurance Company a/k/a Mass

2

Mutual and a/k/a Mass Mutual Financial Group (hereinafter, "Mass Mutual").  Pursuant to

the Debtors' Fourth Amended Joint Plan of Reorganization (hereinafter, the "Plan") the

Committee has been authorized, pursuant to sections 11.01, 11.02 and 11.03 of the Plan

to file and prosecute this action.  The Committee, together with the reorganized Debtors

has filed a Motion for Summary Judgment (hereinafter, the "Motion"),  Adv. ECF No. 52,

solely on one claim asserted under the Fourth Cause of Action of their Complaint.[2]

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over

the instant proceeding by virtue of 28 U.S.C. §1334(b); and this Court derives its authority

to hear and determine this matter on reference from the District Court pursuant to 28

U.S.C.§§157(a)(b)(1).  This is a "core proceeding" pursuant to 28 U.S.C. §§157(b)(2)(F)

and (H).

## III. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56(c)(2)[3], made applicable to these proceedings by

Federal Rule of Bankruptcy Procedure 7056, directs that "[a] motion for summary judgment

'may properly be granted . . . only where there is no genuine issue of material fact to be

tried, and the facts as to which there is no such issue warrant judgment for the moving

---

[2]In the Fourth Cause of Action, the Plaintiffs allege that the Defendant received preferential transfers from the Debtors in violation of 11 U.S.C. §547 and that they are recoverable under 11 U.S.C. §550.

[3]Federal Rule of Civil Procedure 56 was amended effective December 1, 2010.  However, because the record reflects that the bankruptcy was filed in 2008, that the present adversary proceeding was commenced in October 2010, and that summary judgment pleadings have been submitted by the Plaintiffs in compliance with the prior version of the rule, the Court has determined to apply Rule 56 effective as of December 1, 2009 and prior to the most recent amendments.  *See* Fed. R. Civ. P. 86(a)(2)(B).

party as a matter of law.'" *Gaud-Figueroa v. Metropolitan Life Ins. Co.*, 771 F. Supp.2d 207, 211 (D.Conn. 2011) (quoting *In re Dana Corp.*, 574 F.3d 129,151 (2d Cir. 2009)). Upon consideration of a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also*, *In re Dana Corp.*, 574 F.3d at 151.

The moving party has the burden of showing that there are no material facts in dispute, and all reasonable inferences are to be drawn, and all ambiguities resolved, in favor of the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also United Transp. Union v. National R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)); *see also Havey v. Homebound Mortgage, Inc.*, 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252). The Court, in ruling upon a summary judgment motion, "'cannot try issues of fact, but can only determine whether there are issues of fact to be tried.'" *R.G. Group, Inc. v. Horn & Hardart*

4

*Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *Empire Electronics Co. v. United States*, 311 F.2d 175, 179 (2d Cir. 1962)).

## IV. PROCEDURAL BACKGROUND

On October 14, 2008, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (hereinafter, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York. On October 22, 2008, the cases were ordered jointly administered, with Affinity Health Care Management, Inc. (hereinafter, "Affinity") to serve as the lead case. Thereafter, on October 30, 2008, the cases were transferred to the United States Bankruptcy Court for the District of Connecticut and assigned docket numbers 08-22175 and 08-22177 through 08-22180. The Debtors' Plan was confirmed by the Court on or about May 26, 2010. It was thereafter modified on several occasions and reconfirmed, as so modified, on or about August 5, 2010.

This adversary proceeding was commenced by a Complaint filed on October 13, 2010, seeking to avoid, as preferential transfers under §547(b), and/or as fraudulent transfers under §§544(b) and 548(a)(1)(B), recoverable under §550(a), various repayments of advances of money purportedly consisting of principal and interest (itemized on Plaintiffs' Exhibits A and B attached to the Complaint) made by the Debtors to the Defendant, as well as to Mass Mutual (which is not a part of the Plaintiffs' Motion herein).

In Plaintiffs' First Cause of Action, the Plaintiffs allege that the transfers consisting of interest payments on various advances as indicated on Schedule A, were not supported by fair consideration, were made in exchange for less that reasonably equivalent value, were made arbitrarily and gratuitously and thus, constitute fraudulent transfers under Bankruptcy Code §548(a)(1)(B), recoverable under Code §550(a). In the Second Cause

of Action, the Plaintiffs claim that the interest charged on the advances were excessive and as a consequence, the Debtors did not receive reasonably equivalent value or fair consideration and thus, constitute fraudulent transfers under Bankruptcy Code §548(a)(1)(B), recoverable under §550(a). In the Third Cause of Action, the Plaintiffs claim that the transfers itemized on Schedules A and B were fraudulent as to existing and future creditors of the Debtors and therefore are avoidable under Bankruptcy Code §544(b) and recoverable under §550(a). In the Fourth Cause of Action, the Plaintiffs seek the recovery of certain interest payments numbered 9 through 43 on Schedule A and repayment of advances listed on Schedule B for periods beginning October 17, 2007 through September 22, 2008 as preferential transfers to an "insider" within the meaning of Bankruptcy Code §547 and recoverable pursuant to §550.[4] In their prayer for relief, the Plaintiffs are seeking the recovery of "no less" than $414,171.23 with respect to the transfers listed on Schedule A and the aggregate amount of advances listed on Schedule B (which Plaintiffs do not total but which add up to 12.2 million dollars) offset by documented "new value," plus interest, costs and fees.

Thereafter, on December 8, 2010, the Defendant filed *Answer of Murray Wellner, M.D.,* Adv. ECF No. 10, denied each of the Plaintiffs' allegations in the four causes of action and asserted as affirmative defenses to the preference claims in the Fourth Cause of Action that said transfers are excepted from recovery pursuant to Code §§547(c)(1), (c)(2) and (c)(4), and additionally that said claims and causes of action are barred by the statute of limitations. On September 20, 2012, the Plaintiffs filed the Motion, accompanied by a *Local*

---

[4]The Fifth Cause of Action relates only to Mass Mutual.

*Rule 56(a)1 Statement*, Adv. ECF No. 52-1, and a *Memorandum of Law In Support of Motion for Summary Judgment* (hereinafter,"Plaintiffs' Memorandum")*,* Adv. ECf No. 53*, Affidavit of Lucas Rocklin Esq. in Support of Motion for Summary Judgment,* Exhibit A and Exhibits 1- 9, Adv. ECF No. 53-1 to 10.  In the Motion brought on the basis of the Plaintiffs' Fourth Cause of Action, the Plaintiffs are seeking the recovery as preferential, two transfers made to the Defendant within 90 days of the bankruptcy petitions, totaling  $210,000.  On January 12, 2013, the Defendant filed a *Memorandum of Law in Opposition to Motion for Summary Judgment* (hereinafter, "Memorandum in Opposition"), Adv. ECF No. 74, a *Local Rule 56(a)2 Statement,* Adv. ECF No. 74-1, *a Declaration of Frederick J. Dalicandro, Jr.* (hereinafter, "Dalicandro"), Adv. ECF No. 74-2 and Exhibits A-D, Adv. ECF No. 74-3 to 8. In the Memorandum in Opposition, the Defendant asserts Bankruptcy Code §547(c)(2) as an affirmative defense.  The Motion is ripe for resolution.

## V. UNDISPUTED FACTUAL BACKGROUND

The following factual background is derived from the summary judgment pleadings of the parties, including, *inter alia*, the Plaintiffs' Local Rule 56(a)1 Statement and the Defendant's Local Rule 56(a)2 Statement, and Affidavits and Exhibits, including Depositions of the Defendant, Adv. ECF No. 53-4, and of Samuel Strasser (formerly Chief Operating Officer of the Debtors and now the Vice-President of Affinity), Adv. ECF No. 53-2, as well as the Court's independent examination of the official record of the instant bankruptcy cases and adversary proceeding.

At all relevant times, the Debtors' owned and operated four skilled nursing facilities in Connecticut. Affinity was the management company that exclusively managed, operated,

oversaw and did the billing for the other Debtors. The Debtors utilized a unified cash management system under the control of Affinity.  The Debtors, having cash flow problems beginning in 2005, sought financing from third parties, including from the Defendant.  The Defendant is a medical doctor who practices internal medicine in West Hartford, Connecticut.  For as many as seven years, the Defendant was the Medical Director for the Debtor, Health Care Investors, Inc. d/b/a Alexandria Manor, but his employment ended many years before the bankruptcy filings.  At all relevant times, he was the personal physician to Strasser and to Benjamin Fischman (hereinafter, "Fischman") the President, CEO and managing member of the Debtors, as well as a personal friend of both.

Beginning in May 2005, the Defendant made unsecured loans to Affinity in a manner similar to a revolving line of credit out of several checking accounts over which the Defendant had control, usually from an account in the name of The Murray Wellner Living Trust, but on at least two occasions from an account in the name of  Murray I. Wellner MD, PC.  The loans were made because Affinity often faced a short fall in its accounts during the course of a month, continuing until such time as it received Medicaid reimbursement payments from its largest debtor, the State of Connecticut (hereinafter, the "State").  The amount of the loans ranged from one hundred thousand ($100,000) dollars to as much as five hundred thousand ($500,000) dollars.  All of the loans were "informal" and there were "no real terms" for the loans. The Defendant maintained a crude and incomplete handwritten log, generally unintelligible to anyone but himself, of the loans to the Debtors. The log does not appear to include the date when the Affinity repaid the Defendant or when payments were supposed to be made by Affinity. The Defendant did not send invoices to Affinity or otherwise request repayment from Affinity.

8

Generally as it would operate, the Defendant would turn over to Affinity a check in an amount requested by Affinity and the loan would be repaid by Affinity in full or in part to the Defendant by one or more checks, a week or two later, after its receipt of payment from the State.   At the time of repayment, Affinity would indicate to the Defendant when the check or checks could be deposited.   At the same time or shortly thereafter, Affinity would pay an additional sum by separate check to the Defendant which it characterized as interest on the loans.   No specific interest rate was agreed upon by the parties.   The interest payments were usually rounded off, most often in the range of 9 or 10 thousand dollars. Often, at the same time repayments were received, additional loans would be made to the Debtors, which would be repaid, in full or in part, a week or two later, with interest paid separately.   On occasion, the Defendant gave Affinity multiple, pre-dated checks each with a different date, spaced about two weeks apart, so as to indicate when the Debtors could deposit each check.   Since 2005, several hundred checks have been exchanged between Affinity and the Defendant.   Notwithstanding the payments of interest, Affinity never prepared or sent to the Defendant and/or Internal Revenue Service any 1099 tax reporting documents.

Subsequent to the filing of the bankruptcy petitions, on a date or dates between November and December 2010, Fischman, on behalf of Affinity and the Defendant signed an estimated seventy (70) backdated promissory notes[5] (hereinafter, the "Notes"), in sums

---

[5]Two other promissory notes (and a letter acknowledging liability, *see* p.18, *infra*), apparently prepared at a different time, were attached as Exhibit D to the Defendant's Memorandum in Opposition, Adv. ECF No. 74-8. While the notes bear dates of 2006 and 2007, periods prior to the bankruptcy filings, the creation of the notes during those years is inconsistent with the Defendant's deposition testimony in which he stated he had never received a promissory note prior to the bankruptcy filings (Wellner Deposition, Adv. ECF No. 53-4  p. 34). The discrepancy had not been explained.

ranging from two hundred to five hundred thousand dollars in favor of the Defendant

covering periods beginning May 5, 2005 and ending September 15, 2008, Adv. ECF No. 53-

7.  In the Wellner Deposition, Adv. ECF No. 53-4, pp 102-103, he testified that the Notes

were prepared by Dalicandro, Affinity's former consultant[6] at the Defendant's direction, in

connection with a state court divorce modification proceeding in which the Defendant was

involved.  The Notes were produced to enable the Defendant's attorney to establish that he

had lost a substantial sum of money and therefore adjust his alimony obligations.[7]  He

conceded that the purported dates on the Notes, dates of repayment, and amount of

interest paid[8] were not accurate. He testified that the Notes were nevertheless signed by

Affinity as "a favor" to help him out.  Wellner Deposition, p.105.

    For the purposes of this Motion, the Plaintiffs are seeking to recover as preferences,

two payments made payable by check to the Defendant, the first, check number 15069 for

$10,000 representing a payment of interest, dated September 19, 2008 and deposited on

that date by "Murray Wellner" into the Murray Wellner Living Trust account and the second,

check number 15069 for $200,000, dated September 22, 2008 and deposited on

---

[6]Prior to the bankruptcy, Dalicandro worked as a consultant to the Debtors with respect to its medical reimbursement claims.

[7]"My initial agreement with my wife, my former wife was that I was to give her half of my income, and the loss that I took, the big loss that I took affected my income. So I had to prove or show the modification attorneys that my income wasn't what it was, but was much less." Wellner Deposition, p. 104.

[8]While all parties agreed that Affinity exclusively determined the amount of interest to be paid, that it was paid by check in rounded off sums and not calculated at an annual rate, the Notes indicated that interest was payable at annual interest rates ranging from 10% per annum  to 30% per annum.  In reality, because the loans were of such short duration, the interest that was paid if recalculated at an annual interest rate, would far exceed even the highest rates on the Notes.
    Additionally, although the "2008" Notes indicate that he was paid interest on the loans, the Defendant testified at his deposition that in order to reduce his tax liability, he later re-characterized the interest payments Affinity made in 2008 as payments of principal. Wellner Deposition, p. 119.

September 22, 2008 by "Murray Wellner" into the Murray I. Wellner MD PC account.

Previously, on July 22, 2008, and again on July 23, 2008, the Defendant made two loans to Affinity in the amount of four hundred thousand ($400,000) each.  On September 3, 2008, a check for one hundred thousand ($100,000) dollars from the account of Murray I. Wellner MD PC, was loaned to Affinity and deposited into Affinity's account on September 5, 2008.  A second check dated September 3, 2008 for one hundred thousand ($100,000) dollars from the account of Murray I. Wellner MD PC, was also paid to Affinity and deposited into Affinity's account on September 19, 2008. The last loan made by the Defendant to Affinity was on September 15, 2008 in the amount of five hundred thousand ($500,000).   At the time the bankruptcy was filed, the Debtors were indebted to the Defendant in the approximate amount of 1.3 million dollars. There is no indication on either the $200,000 or the $10,000 check or on a separate contemporaneous writing that these payments were intended to repay all or in part any particular outstanding loan.

## VI. DISCUSSION

**A.     Whether the Plaintiffs Have Met Their Burden Under Section 547(b).**

Bankruptcy Code Section 547(b) provides in relevant part as follows:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–
   (1) to or for the benefit of a creditor;
   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
   (3) made while the debtor was insolvent;
   (4) made–
      (A) on or within 90 days before the date of the filing of the petition; . . . and
   (5) that enables such creditor to receive more than such creditor would receive if–
      (A) the case were a case under chapter 7 of this title;
      (B) the transfer had not been made;  and

11

> > (C) such creditor received payment of such debt to the
> > extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2008).

According to the legislative history of section 547(b),

> [t]he purpose of the preference section is two-fold. First, by permitting the trustee to avoid pre-bankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during [its] slide into bankruptcy. The protection thus afforded the debtor often enables [it] to work [its] way out of a difficult financial situation through cooperation with all of [its] creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of [its] class is required to disgorge so that all may share equally.

*Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 40 (2d Cir. 1996)

(quoting *H. Rep. No. 595, 95th Cong., 1st Sess.* 177-78 (1977)).

The Plaintiffs bear the ultimate burden of proof by a preponderance of the evidence on all of the elements of a preferential transfer under §547(b). 11 U.S.C. § 547(g) (2005).

A transfer may be avoided as preferential by establishing *all* of the following:

> (1) the transfer is of an interest of the debtor in property;
> (2) to or for the benefit of a creditor;
> (3) on account of an antecedent debt;
> (4) made while the debtor was insolvent;
> (5) within 90 days of bankruptcy or within a year of bankruptcy if the creditor was an insider;
> (6) and the transfer enabled the creditor to receive more than it would have received in a chapter 7 liquidation had the transfer not taken place.

*In re Flanagan*, 503 F.3d 171, 180 (2d Cir. 2007), *citing In re Roblin Industries, Inc.*, 78 F.3d at 34.

For purposes of the Plaintiffs' Motion, by failing to object, the Defendant is deemed to have conceded that Plaintiffs have made an adequate showing as to elements (1), (3),

(5) and (6).  *See* Memorandum in Opposition.  With respect to element (2), the Defendant

argues that the two preference payments at issue were not paid to a "creditor" since the

loans originated from an account held in the name of Murray I. Wellner MD PC, and the

repayment of the loans and payment of interest were deposited into two non-Defendant

accounts, one check for $200,000 into the Murray I. Wellner MD PC account and the other

check for $10,000 into The Murray Wellner Living Trust account.  As to element (4), the

Defendant argues that the Plaintiffs have not met their burden of establishing that the

Debtors were insolvent at the specific time the transfers of the two checks occurred.  The

two disputed elements will be considered in reverse order.

### 1.    Whether the Plaintiffs Have Established That the Debtors were "Insolvent" Within the Meaning of §547(b)(3) at the Time the Transfers Occurred.

Bankruptcy Code section 101(32) states in relevant part:

> The term "insolvent" means--
> (A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of–
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors . . . .

"Fair value in the context of a going concern, is determined by the fair market price of the

debtor's assets that could be obtained if sold in a prudent manner within a reasonable

period of time to pay the debtor's debts." *In re Roblin Industries, Inc.*, 78 F.3d at 35.

"Insolvency is a question of fact." *Id*.

Section 547(f) provides that "the debtor is presumed to have been insolvent on and

during the 90 days immediately preceding the date of the filing of the petition."[9]   "The creditor can satisfy its initial burden of rebutting the presumption of insolvency by introducing evidence that tends to suggest that the debtor was solvent at the time the transfer was made."  Collier on Bankruptcy P [547.12] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (hereinafter, "Collier on Bankruptcy").  The Defendant claims that he has met that burden by reference to Affinity's schedules which he claims show that during the 90 days prior to the bankruptcy its assets exceeded its liabilities.[10]  He also relies on an Affidavit prepared by Affinity's former consultant, Dalicandro.

The presumption of insolvency may be rebutted if the debtor's schedules submitted in support of its bankruptcy petition indicate that assets exceed liabilities . . . .  *See In re Roblin Industries, Inc.* 78 F.3d at 34; *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1322 (9th Cir. 1989).  However, "[f]air value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."  *In re Roblin Industries, Inc.* 78 F.3d at 35.  The Defendant has presented no evidence as to the Debtors' market value at the time of the transfers to rebut the presumption.

Further, an examination of Affinity's schedules reveal that they are anything but clear on the matter of solvency.  On Exhibit "A" to the Voluntary Petition filed on October 14,

---

[9]The Plaintiffs have bolstered the presumption of insolvency by including as exhibits to their Motion a transcript of the deposition of Strasser, the former chief operating officer, who testified to cash flow problems faced by the Debtors and their inability to pay normal operating debts when they fell due as well as their inability to obtain conventional bank financing, forcing the Debtors to seek financing from unconventional sources such as that of the Defendant. *See Strasser Deposition* pp. 34-43.

[10]While the Defendant does not specifically refer to the other Debtors' schedules, including those that were amended, a review of them does not indicate that any other Debtor listed its assets as exceeding its liabilities.

2008, ECF No. 1-2, Affinity valued its assets at $700,000 and its debts at $6,762,000.

Thereafter, in its Summary of Schedules filed December 3, 2008, ECF No.165-3, Affinity

valued its assets at  $130,060.10 and its liabilities at $7,183,370.33. On the other hand,

Schedule B - Personal Property, ¶16, ECF No. 165-1, filed at the same time, indicates,

"Approximately $5,000,000 owed from various affiliates for Management Fees,"  which,

under the heading "Current Value of Debtor's Interest in Property . . .," is described as

"Unknown."  This conflict can only be reconciled by interpreting Affinity's  failure to list these

receivables on its Summary of Schedules as evidence of its belief that the receivables were

of questionable value.

The Defendant specifically cites as evidence of Affinity's solvency Amended

Schedule B - Personal Property ¶16 (annexed schedule) filed January 30, 2009, in which

Affinity listed amounts due to it from its affiliates, itemized as follows:

> Note Receivable Douglas Telephone Lease $13,249.81
> Note Receivable Ellis Telephone Lease $10,122.67
> Note Receivable Alexandria LLC $129,999.00
> Due From Alexandria Manor $1,382,607.48
> Due From Blair Manor $1,290,302.14
> Due From Blair Manor LLC $38,262.29
> Due From Crescent Manor $1,514,736.18
> Due From Douglas Manor $1,725,775.56
> Due From Ellis manor $1,982,285.15

But again, on that same page under the heading "Current Value of Debtor's Interest in

Property . . ." it describes said amount as "Unknown."  As with the earlier filed schedules,

the dubious value of receivables due from insolvent affiliates is buttressed by the fact that

Affinity's Amended Summary of Schedules, ECF No. 245, excludes mention of the

receivables and values Affinity's assets at $47,500 and its liabilities at $7,153,810.36. Thus,

the various schedules filed by Affinity can only be described at best as inconclusive.

15

A financial statement showing a debtor's positive net worth may also be sufficient to rebut the presumption of insolvency.[11]  Upon a successful showing, the burden will then revert to the plaintiff to prove that the debtor was in fact, insolvent when the transfer was made.[12]  Although the Dalicandro Affidavit asserts that Affinity "maintained" a receivable from the State in an amount in excess of 15 million dollars, there is no specific mention in Affinity's Schedules about that alleged debt of the State.[13]  Further, the Dalicandro Affidavit includes no information to support the fair market valuation of the alleged receivable from the State; in particular, its collectibility.[14]  Finally, the testimony of Strasser suggests that the Debtors' books and records are unreliable as a means of determining the debtors' solvency. When Strasser was asked in his deposition whether the million plus loans from Wellner were recorded on the Debtors' books and records he said "no."[15]  Thus, while the issue of solvency is "material" to the Motion, neither the bald Dalicandro Affidavit nor the

---

[11]*Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 258 (8th Cir. 1996).

[12]See 11 U.S.C. § 547(g).

[13]In his deposition, Strasser was questioned by Plaintiffs' counsel about this supposed debt of the State of Connecticut.  At first, he limited his response to stating that it was based upon verbal promises made to him by representatives of the Conn. Dept. of Social Services and until later coaxed, refused to put a specific value on it. ("Well again, it depends on what they thought and what we said but — you know, I can't put a number on it"). Strasser Deposition, p. 40. *See Cellmark Paper Inc. v. Ames Merchandising Corp. (In re Ames Dept. Stores, Inc.)*, No. 12-1269-bk, 2012 U.S. App. LEXIS 26335, at *4-5 (December 26, 2012); (statements of the debtor's executives about their expectations for the company once it exited bankruptcy were insufficient to overcome the presumption).

[14]E]vidence of the book value of [a debtor's] assets, without more, is ordinarily insufficient to establish solvency under the Code, which is a concept based on the fair market value of the debtor's assets. . . . . Book value may be relevant in determining fair market value, but it does not compel the fact finder to draw an inference of solvency."*In re Ames Dept. Stores, Inc.*, 2012 U.S. App. LEXIS at *4; ("It is also true that book values are not ordinarily an accurate reflection of the market value of an asset"). *In re Roblin Industries, Inc.*, 78 F.3d at 36.

[15]"Q. After Dr. Wellner made a loan to Affinity, was the loan put on the books and records of Affinity? A. I say no." Strasser Deposition p. 69.

inconclusive schedules, set forth "'specific facts'" demonstrating that there is "'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). Here "the evidence is so one-sided that [the Plaintiffs] must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

### 2.    *Whether the Payments Were To or For the Benefit of a Creditor*.

Under Bankruptcy Code §101(10)(A) a "creditor" is defined, in relevant part, as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." A "claim" is defined, in relevant part, in §101(5)(A) as a "right to payment . . . . " It is unclear from the Defendant's Memorandum in Opposition if he is arguing that he is not a creditor because the two checks were allegedly in repayment of two loans paid out of the account of Murray Wellner MD PC, or that he was not the true recipient of the allegedly preferential transfers because following his receipt of the two checks, he deposited one into the account of Murray Wellner MD PC and one into the account of The Murray Wellner Living Trust. Either way, his arguments do not refute the overwhelming evidence that the Defendant was a creditor of the Debtors, and the payments were for his benefit.

Firstly, the record is unclear as to whether the $200,000 and the $10,000 were intended to be repayment with interest of loans that were drawn from the Murray Wellner Living Trust or from the Murray Wellner MD PC accounts. Further, regardless of the checking account from which the various loans were drawn, beginning with the commencement of their financial arrangement in 2005, the loan participants considered the loans as having come from Wellner and that it was Wellner who was entitled to

17

repayment.[16]  Amended Bankruptcy Schedule F, a copy of which the Defendant attached

in support of his Memorandum in Opposition as Exhibit C (part 2), Adv. ECF No. 74-6, lists

an unsecured debt of 1.3 million dollars owed by Affinity to "Murray Wellner, M.D."

Notwithstanding their not being listed elsewhere in the Debtors' schedules, neither Murray

Wellner MD PC, nor The Murray Wellner Living Trust filed a proof of claim in these cases.

Further, the estimated seventy (70) backdated Notes (*supra* pp. 9-10), were signed

by Fischman on behalf of Affinity and by Wellner in his individual capacity only.  Exhibit D

attached to Defendant's Memorandum in Opposition, Adv. ECF No. 74-8, is a signed hand-

written "letter" from Fischman and Strasser dated April 14, 2008, in which they confirm that

they and Affinity owe to "Dr. Murray Wellner on a revolving monthly account approximately

$1,500,000 to $1,600,000."  Accompanying the "letter" are two other promissory notes, one

for $1,090,000, dated "6/5/7" and signed by Strasser and another for $400,000 also signed

by Strasser dated "11/15/06."  To what extent the dates on the notes are accurate and

whether those particular notes were ever paid off is irrelevant at this point but what is

relevant is that both notes only promised to pay "Dr. Murray I. Wellner."

Further, as noted earlier, the two allegedly preferential checks, one for $200,000 and

the other for $10,000 were both made payable to Murray Wellner, M.D. and were endorsed

by him in his individual capacity.  While the $200,000 check was deposited into Murray

---

[16]The Defendant was asked during his deposition from what accounts the loans were generally
made. His answer is revealing:
     A.     Mine came from my personal bank account, Bank of America . . . .
     Q.     That's a Bank of America account in your personal name?
     A.     Personal money.
     Q.     Is that a joint account or is there –
     A.     It's just me. It's a trustee account actually, but it's personal.  Wellner Deposition, Adv.
ECF No. 53-4 Ex. 3, pp. 52-53.

Wellner MD, PC account, the check for $10,000 in interest, was instead deposited into the Murray Wellner Living Trust account.  All this would suggest that the Defendant used the two accounts interchangeably.  Further, the fact that the checks were made payable to Wellner alone indicates that the Debtors intended to repay a debt that they acknowledged owing to the Defendant and not to any other party.

The Defendant cites two cases in support of his position that he was not the recipient of the alleged preferential transfers because he deposited them into the Murray Wellner MD PC or the Murray Wellner Living Trust accounts and not into an individually named account. He first cites *Barnhill v. Johnson*, 503 U.S. 393 (1992), as suggesting that the transfers did not occur until they were deposited into the respective checking accounts and therefore, if there were any preferential transfers, they were received by Murray Wellner MD, PC and the Murray Wellner Living Trust.  However, that case concerned whether the Defendant Barnhill had received a "transfer" of the debtor's property within 90 days of the bankruptcy petition, and the Supreme Court was required to determine whether the "transfer" of a check occurred upon delivery of the check or its honoring by the bank. The *Barnhill* court held that it was the date of deposit that determined the beginning of the 90 day preference period because there was no unconditional transfer of the debtor's interest in property until the check was deposited.  It did not consider what interest, if any, the holder of the checking account, if different from the payee, might have had in the funds once deposited.  The Defendant also cites a Connecticut Appellate Court decision, *Grass v. Grass*, 47 Conn. App. 657, 706 A.2d 1369 (1998), as additional support for his position that the transfers were not made to the Defendant because the checking accounts into which the funds were deposited were not joint accounts with the Defendant.  While "Congress has generally left

19

the determination of property rights in the assets of a bankrupt's estate to state law," *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914 (1979), this decision offers no support for his position.  In *Grass*, the daughter of a decedent claimed ownership of a bank account which the decedent opened in her own name and ostensibly with that of her daughter and into which she deposited funds prior to her death.  In reversing the determination of the trial court, the Appellate Court ignored the intent of the decedent and looked only to the plain language of the deposit account which required the signature of both individuals for it to be considered a joint account, concluding that because the daughter never signed the required authorization card, she was not a joint owner of the account.  Here the issue is the effect of the Defendant's choice to *deposit* the funds into his business accounts and whether his choice to do so affects whether he is a transferor for preference purposes.

While Bankruptcy Code §550, separately establishes the means of recovery for a transfer otherwise determined to be avoidable, it is also useful as a reference point in determining whether the Defendant is a transferee from whom the payment can be recovered.  This section provides in relevant part,

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from–
>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>> (2) any immediate or mediate transferee of such initial transferee.

As indicated above, §550(a)(1) and (2) permits a recovery from the initial transferee, the entity for whose benefit the payment was made (such as a guarantor or debtor of the initial transferee) or any "immediate or mediate transferee."  "These additional sources of

recovery protect the trustee against attempts to impede recovery by an initial transferee and give the trustee a degree of flexibility when the actual transferee or its assets have disappeared or when recovery of the property would not suffice, *e.g.*, when the property has depreciated."  Collier on Bankruptcy P [550.02].  Here the Plaintiffs have chosen to seek recovery from the initial transferee.  While the Bankruptcy Code does not define the term "initial transferee," in the Second Circuit as in others, courts apply the "dominion and control" test.  *See Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57-58 (2d Cir.1997), *Tese-Milner v. Brune (In re Red Dot Scenic, Inc.)*, 293 B.R. 116, 119 (S.D.N.Y. 2003).  To qualify as an "initial transferee," an entity must be more than a "mere conduit" that facilitates the transfer between the debtor and a third party.  *In re Finley*, 130 F.3d at 57-58.  The entity must exercise dominion over the transferred assets, or have the right to use the assets for its own purposes.  *See id.* at 58.  Since the checks were payable to him alone, the Defendant could have chosen to cash the checks directly or sign them over to another person or entity.  In actual fact, he deposited one check into one account and the other check into a different account.  The fact that the Defendant decided to deposit the checks into his checking accounts is irrelevant to the determination of whether he is a "transferee."

In sum, the Plaintiffs have clearly established that the transfers were made to Wellner as a creditor of the Debtors and the Defendant has put forth no "specific facts" demonstrating that there is "a genuine issue for trial."  Further, as a matter of law, Wellner's decision to deposit the checks into an account other than a named individual account does not affect his standing as a transferee.  Thus, combined with the failure of the Defendant to rebut the presumption of the Debtors' insolvency, the Plaintiffs have met their burden of

establishing the elements of §547(b).

## B.    Whether the Defendant Has Established Under Section 547(c)(2) That the Transfers Were Exempt from Avoidance.

Notwithstanding that the Plaintiffs have satisfied the required elements of §547(b),

the Defendant may still prevail if he can establish that he is entitled to rely on one of the

defenses set forth in §547(c) that defeat an otherwise avoidable preferential transfer.  In

particular, the Defendant has raised §547(c)(2)(A) as an affirmative defense and bears the

burden of proof.[17]  This section provides in relevant part:

(c) The trustee may not avoid under this section a transfer –

* * * *

> (2) to the extent that such transfer was in payment of a debt
> incurred by the debtor in the ordinary course of business or
> financial affairs of the debtor and the transferee, and such
> transfer was –
> (A) made in the ordinary course of business or financial
affairs of the debtor and transferee . . . .

11 U.S.C. §547(c)(2)(A) (2008).

The Defendant contends that Affinity's transfers to him are protected from recovery

under §547(c)(2)(A). This section has two elements.  First,  a defendant must establish that

the *debt* at issue was incurred by the debtor and transferee in the ordinary course of

business or financial affairs of the debtor and transferee.  Secondly, a defendant must also

establish that the *transfer* was made in the ordinary course of business or financial affairs

of the debtor and transferee.  Most courts focus on this second element, often ignoring the

first.

The purpose of the ordinary course of business exception is to "'benefit all creditors

---

[17]*See*  11 U.S.C. § 547(g).

by deterring the "race to the courthouse" and enabling the struggling debtor to continue to operate its business.' *Union Bank* [v. Wolas], 502 U.S. [151] at 161, [(1991)]; *accord In re Roblin Indus., Inc.*, 78 F.3d 30, 40-41 (2d Cir. 1996);" *Leberman v. U.S. Xpress Enterprises.*, 5:10-CV-1090, 2011 U.S. Dist. LEXIS 139359, at *8-9, (N. D. N. Y. December 5, 2011); "The purpose of this defense is to protect normal financial relations between a debtor and its creditors, since such a protection does not violate the general policy of the preference section to discourage unusual payment practices shortly before the bankruptcy case is filed. *In re Craig Oil Company*, 785 F.2d 1563, 1566 (11th Cir. 1986) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 373-74 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 6329)." *Osborne v. Howell Electric Motors (In re Fultonville Metal Products Co.)*, 330 B.R. 305, 310-311 (Bankr. M.D. Fla. 2005).

Because it is an affirmative defense, requiring a factual determination and the burden of proof rests with the Defendant, some courts have held it inadvisable for the ordinary course of business defense to be determined on a summary judgment motion. *See Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp. (In re Ice Cream Liquidation, Inc.)*, 320 B.R. 242, 250 (Bankr. D. Conn. 2005). On the other hand, because of the important policies served by preference law, courts have also repeatedly held that the exceptions contained in Code §547(c), including the ordinary course of business exception, "should be narrowly construed," *In re CIS Corp.*, 214 B.R. 108, 119 (Bankr. S.D.N.Y. 19997) (citations omitted); *Ames Merch. Corp. v. Cellmark Paper Inc. (Ames Dep't Stores, Inc.)*, 450 B.R. 24, 32 (Bankr. S.D.N.Y. 2011).

Therefore, the first step in the process of determining whether the Defendant can defeat the Motion is to examine the record to see if it is adequate, without the necessity of

additional evidence,  to ascertain whether the *debts* were incurred in the ordinary course

of the business or financial affairs of the Debtors and the Defendant transferee.

> The focus in the analysis is on the nature of the original transaction creating
> the debt. *Official Comm. of Unsecured Creditors of Toy King Distribs. v.
> Liberty Sav. Bank, FSB (In re Toy King Distribs.)*, 256 B.R. at 114 (internal
> citations omitted) (emphasis added). "[c]ourts generally are interested in
> whether or not the debt was incurred in a typical, arms-length commercial
> transaction that occurred in the marketplace, or whether it was incurred as an
> insider arrangement with a closely-held entity." *Huffman v. New Jersey Steel
> Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr.W.D.Va. 1995)
> *cited in Toy King Distribs.*, 256 B.R. at 114.

*Ogier v. Trautman (In re Express Factors, Inc.)*, No. 04-06076, 2005 Bankr. LEXIS 2156,

at *16 (Bankr. N.D. Ga. Sept. 30, 2005).  "[A] debt will be considered not incurred in the

ordinary course of business if creation of the debt is atypical, fraudulent, or not consistent

with an arms-length commercial transaction. *Pioneer Technology, Inc. v. Eastwood (In re

Pioneer Technology, Inc.)*, 107 B.R. 698, 702 (B.A.P. 9th Cir. 1988); *In re Valley Steel

Corp.*, 182 B.R. 728, 735 (Bankr. W.D. Va.1995); *McCullough v. Garland (In re Jackson)*,

90 B.R. 793, 794 (Bankr. D.S.C. 1988)." *Speco Corp. v. Canton Drop Forge (In re Speco

Corp.)*, 218 B.R. 390, 398 (Bankr. S.D.OH 1998).

It is undisputable that the debts at issue here were not incurred as they would have

been in a "typical, arms-length commercial transaction."  On the other hand, as the court

*in Huffman v. New Jersey Steel Corp*. 182 B.R. at 734-35 also observed, this analysis

"contemplate[s] a subjective test: Was the debt and the transfer ordinary as between the

debtor and the creditor? To be subjectively ordinary implies some consistency with other

business transactions between the parties." *Id.*  From a review of the series of loan

transactions between the parties since 2005, this informal, undocumented method of

borrowing was, in fact, the usual manner by which they conducted business.  As it concerns

the loans at issue in this Motion, it may be unclear as to which checking account the funds came out of.  Nevertheless, as discussed above, between the parties, the name on the account was irrelevant.  The loans were always treated as having been made by Wellner and were expected to and were consistently repaid to him.

In the end however, the generally consistent procedure followed by the parties in both lending and repaying the loans, cannot convert their extreme irregularity, as discussed in more detail below, into debts incurred in the ordinary course of business.  Conduct alone does not become "ordinary" just by virtue of its repetition.  While the test is admittedly subjective, implicit in the analysis is an assumption that the loans meet a basis test of legitimacy and objective fairness.  Otherwise, loans that are patently illegal could, if made in a consistent manner also be considered to be the ordinary course of business.  Yet many courts, including this one, *see Daly v. Simeone (In re Carrozzella & Richardson)*, 270 B.R. 325, 333 (Bankr. D.Conn. 2001), have found that the ordinary course of business exception does not apply to a business enterprise involved in a Ponzi scheme, even where similar transactions were conducted between the debtor and the defendant over long periods of time ("a transfer by a Ponzi scheme debtor to a depositor or investor is not in the ordinary course of the business of the debtor, and/or does not follow ordinary business terms, since no lawful entity *ordinarily* pays fraudulently-obtained revenue to early investors") *Id.*, and "it would be inequitable to allow [the defendant] to obtain a 100% recovery on his claim while relegating other defrauded program participants to general unsecured creditor status. . . ." Equity requires that all these creditors share equally in whatever assets are available." *Danning v. Bozek (In re Bullion Reserve)*, 836 F.2d 1214, 1219 (9th Cir. 1988); *see Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham and Wong, Inc)*, 819 F.2d 214, 217

25

(9th Cir. 1987); *see also Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Creditors Recovery Corp.)*, 376 B.R. 442, 462 (Bankr. S.D.N.Y. 2007) ("the intent of Congress could not have been to facilitate the survival of a fraudulent enterprise or a fraudulent or illegal aspect of a business").  Likewise, as here, where the transactions are difficult of proof because the record keeping is indecipherable or non-existent, the terms of the loans arbitrarily established and where the interest paid on the loans very excessive, it is unreasonable to treat such loans as having met the ordinary course of business test when to do so will be at the expense of legitimate unsecured creditors.

In Strasser's deposition, he testified that he turned to the Defendant for loans once Affinity was no longer able to obtain revolving credit from conventional lenders.  That is not to say that loans from entities specializing in the making of high risk loans would be ineligible to rely on an ordinary course of business defense.  Nor is it significant under these facts that the lender's primary occupation was that of a physician.  It is not the unusual nature of the lender that presents the problem here.  There are many lenders in the market for whom lending money is not their primary occupation.  Rather, it is the method employed in making the loans that takes these loans out of the ordinary course.

As testified to by the Defendant in his deposition, none of the hundreds of loans that were made and repaid were formalized.  He never sent bills to Affinity or actively pursued repayment.  The Defendant received no security for the loans although the loans were for considerable sums of money.  By contrast, the Debtors had previously obtained a loan from Metro Exchange LLC, as consideration for which a security interest in the Debtors' personalty was given.   These loans were patently atypical from ordinary commercial transactions.  There appear to have been no contemporaneously created promissory notes

26

(and the back-dated Notes were inaccurate, if not fraudulent), with no reliable way of documenting the dates the loans were made, in what amounts, and when they were repaid. The loans were not recorded on the books and records of the Debtors.  Most transactions took place when the parties were face-to-face.  Checks were often post-dated.  The interest paid on the loans appears to have been determined by Affinity arbitrarily, in amounts which, if calculated on an annual basis would be exorbitant, and yet was testified to by the Defendant to be a "fair" and "reasonable" return on his investment.  Wellner Deposition, pp. 39 and 55.

The Defendant did not attempt to refute the Plaintiffs' evidence that this arrangement was not typical of normal business relations as conducted by the Debtors in the past.  *See Wild West World, LLC v. Village Charters, Inc.(In re Wild West World, LLC)*, No. 07-5406, 2009 Bankr. LEXIS 4193, at *13 (Bankr. D.Kan., February 10, 2009).  These loans were not merely uncommon, reflecting the range of industry practice, including for those under financial distress, *see In re Roblin Industries, Inc.*, 78 F.3d 30, 42 (2d Cir. 1996); (if that were the case, this interpretation of ordinary course of business might be seen as continuing the requirement that a defendant demonstrate that it meets both a §547(c)(2)(A) defense, as well as that under 547(c)(2)(B)("made according to ordinary business terms").[18]

---

[18]The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) (hereinafter, "BAPCPA") made it easier for a creditor to successfully invoke the "ordinary course" defense by no longer requiring the creditor to show that the debt was incurred and the transfer at issue were in the ordinary course of business of both parties *and* were made according to ordinary business terms. Under BAPCPA, the creditor need show only one or the other, not both. This change substantially eased the creditor's burden of proof, by permitting the creditor to successfully defend against a preference suit if the transfer met industry standards, regardless of whether it was in the ordinary course of business of the debtor and the creditor. Alternatively, the creditor is now protected if the challenged transfer was in the ordinary course of its dealings with the debtor, regardless of whether it was common in the industry.  Nevertheless, the words of the subparagraphs have not changed, and the pre-2005 cases interpreting their requirements remain good law.  Collier on Bankruptcy P [547.04[2]].

The Defendant conceded in his Memorandum in Opposition, p. 5, that the debts were not incurred "according to ordinary business terms."  ("[T]he loans clearly do not reflect a typical business transaction . . .").

Further, the evidence is clear that the Defendant was not an innocent lender who believed that the loans were transactions made in the ordinary course of business.  That is demonstrated by the fact that when he needed to prove to his ex-wife's attorney's (and presumably) divorce court's satisfaction that he had made these loans and that he had suffered substantial losses as a result of the Debtors' bankruptcy, he hired Dalicandro to draw up admittedly false Notes, with inaccurate information as to the dates of the loans, the length of each loan and most particularly, the amount and manner by which interest was paid.  In a similar vein, Affinity's knowledge of the impropriety of the loans is evidenced by its failure to record the loans on its books and records.

In the end, to ratify these loans as "ordinary" for the purposes of §547(c)(2) would lend judicial support to transactions that reward lenders who take advantage of debtors in financial distress and at the same time would reinforce inappropriate conduct by debtors who engage in inappropriate financing arrangements as if they have no accountability for their actions.  Thus, not only has the Defendant not met his burden of proof in establishing that the debts were incurred by the Debtors in the ordinary course of business or financial affairs of the Debtors and the transferee, but conversely, for purposes of the Motion, the Plaintiffs have established that there are no material facts in dispute as to the inapplicability to the Defendant of said affirmative defense.

Because the Defendant has not successfully established the first prong of the 547(c)(2)(A) defense, that the *debt* at issue was incurred by the debtor and transferee in the ordinary course of business or financial affairs of the debtor and transferee, it will be unnecessary for the Court to consider the second prong: whether the *transfer* was made in the ordinary course of business or financial affairs of the debtor and transferee.  Thus,

although the Defendant argues that the transfers were in the ordinary course of business of

the parties in that the repayment of the $200,000 was intended to be a routine repayment

of the two short-term $100,000 loans made by the Defendant several weeks previously (as

opposed to a partial repayment of the more than one million dollars outstanding at the time,

as maintained by the Plaintiffs), the Court does not need to resolve that dispute.[19]

Under Bankruptcy Code §550, (as discussed *supra*, pp. 20-21), the property - or value

thereof - which is the subject of a transfer avoided by a trustee can be recovered from, *inter*

*alia*, "the initial transferee. . . or the entity for whose benefit such transfer was made. . . . "

The Defendant was the initial transferee for whose benefit the loan repayments and interest

were made, and thus, recovery can be had from him. Therefore, the Plaintiffs are entitled to

judgment on their Fourth Cause of Action against the Defendant in the amount of $210,000.

**C.    Whether the Plaintiffs are Entitled to Prejudgment Interest**.

> "An award of prejudgment interest is … within the [bankruptcy]
> court's broad discretion." *In re Q-C Circuit Corp.*, 231 B.R. 506, 513-14
> (Bank. E.D.N.Y. 1999). "The purpose of awarding prejudgment interest is to
> compensate the debtor's estate for the inability to use the property during
> the time it was in the hands of the transferee." *In re Art Shirt, Inc.*, 93 B.R.
> 333, 342 (E.D. Pa. 1988). "Case law suggests that the award of such
> interest [in preferential transfer cases] although frequent, is not automatic.
> *Id*."

*Katz v. Ida K. Stark Trust (In re Van Dyck/Columbia Printing)*, 289 B.R. 304, 318 (D.

Conn. 2003).

---

[19]Nevertheless, as stated *supra* at pp. 10-11, neither the checks themselves, the books and
records of the Debtors nor any other written document specifically supports the Defendant's position that
the alleged preferential payments were intended to repay particular outstanding loans. The Defendant
relies on the Dalicandro Affidavit in which Dalicandro states that the $200,000 was intended to repay the
two $100,000 loans. The Affidavit cites as support the Defendant's September 2008 checking account
statement which shows  the $100,000 checks and the $200,000 payment went in and out of the same
account. That in and of itself does not establish the intent of both parties since so many checks were
changing hands and the Defendant used both of his accounts as personal accounts, to wit, the fact that
the interest paid was not deposited into that particular account.

The Second Circuit has indicated that the following factors are relevant when considering whether to exercise discretion and award prejudgment interest: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833-34 (2d Cir.1992). Consideration of these principles leads to the conclusion that an award of prejudgment interest from the date of the filing of the Complaint on October 13, 2010 is warranted.[20]

The purpose of §547 of the Bankruptcy Code is to preserve the assets of the estate and promote equality of distribution among creditors of the debtor. *See In re Roblin Industries, Inc.*, 78 F.3d at 40. Full compensation to the estate for the avoided transfer normally requires prejudgment interest to compensate for the value over time of the amount recovered. *See Gray v. Travelers Ins. Co. (In re Neponset River Paper Co.)*, 219 B.R. 918, 921 (Bankr. D. Mass. 1998), *aff'd, Neponset River Paper Co. v. Travelers Ins. Co.,* 231 B.R. 829 (1st Cir. B.A.P. 1999); *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers,*

---

[20]In addition to its being the date suggested by the Plaintiffs, it is also particularly appropriate in a preference proceeding because as stated by the court in *In re Indus. & Mun. Eng'g, Inc.*, 127 B.R. 848, 851(Bankr. C.D. Ill. 1990):

> [i]nterest does not run from the date of the preferential transfer, because the transfer is not improper in any respect at the time it occurs. The determination of a preference and the recovery of the transfer under section 550 are based upon a subsequent event-the transferor's bankruptcy filing-and upon a[sic] analysis of the debtor's financial structure within that bankruptcy (i.e., that the transferee would receive more if it retained the transfer than if the debtor's assets were liquidated). Because the transfer is initially proper, and because there must be some affirmative decision made, supported by section 547(b), to recover the transfer, the consensus position is that prejudgment interest does not begin to accrue until some affirmative demand is made of the transferee to return the transfer.

Inc.), 135 B.R. 659, 667 (Bankr. D.Colo. 1991), aff'd, 161 B.R. 507 (D.Colo. 1992), aff'd, 4 F.3d 1556 (10th Cir. 1993), cert. den., 510 U.S. 1114, 114 S. Ct. 1061(1994).

The Court perceives no reason why an award of prejudgment interest in this proceeding is unfair or inequitable.  A court may appropriately consider both fairness and the relative equities of the parties as well as "such other general principles as are deemed relevant by the court"), including the extent to which a defendant acted innocently and had no reason to know of the wrongfulness of his actions, or where there is a good faith dispute between the parties as to the existence of any liability.  See Wickham Contracting Co. v. Local Union 3, 955 F.2d at 834-35.  Although the Defendant does not know the exact extent of his liability until the court issues the judgment, "whether a claim is disputed or not, either as to liability or as to amount, a judgment on the claim does not create liability; it merely recognizes and determines the prior existence of the liability." Neponset, 219 B.R. at 921. Here, the Defendant should have been well aware that the irregular and informal nature of the transfers taking place between the parties, the large number that occurred shortly before the bankruptcy and, in particular, the exceptional amount of interest paid to him by Affinity would invite litigation.

In this Circuit, the prejudgment interest rate is subject to the court's discretion. See SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1476 (2d Cir. 1996), cert. den., 522 U.S. 812, 118 S. Ct. 57(1997).  While section 1961 of Title 28, U.S.C., establishes the rate of interest that is to be paid "on any money judgment in a civil case recovered in a district court," no federal statute exists to set the rate of prejudgment interest.  "The suitability of [28 U.S.C. §1961(a)] for an award of prejudgment interest will depend on the circumstances of the individual case, and the court need not limit the award of prejudgment interest to the rate at

which the injured party would have lent money to the government.  The court may, for example, consider whether the plaintiff would have invested the money at some higher rate, *see generally Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d [270] at 286 [2d Cir. 1992]; or it may take into account the rate of interest the defendant would have had to pay to borrow the money it withheld from the plaintiff (citations omitted)." *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000).

Thus, while in principle the Court would consider awarding more than the federal post-judgment rate, here the Plaintiffs have stated no facts to support the awarding of a rate higher than the federal post-judgment rate, other than their requesting to be awarded interest of 10% per annum pursuant to Conn. Gen. Stat. §37-3a.  Thus, the federal postjudgment interest rate should apply to prejudgment interest on preferential transfers "[i]n the absence of substantial evidence showing that the equities in a particular case require a different rate."). *Crampton v. Dominion Bank* (*In re H.P. King Co., Inc.*), 64 B.R. 487, 492 (Bankr. E.D.N.C. 1986). Further, since preference actions arise only under the Bankruptcy Code, courts awarding interest should look to federal law to determine the appropriate rate.  *See Comm. of Unsecured Creditors of Interstate Cigar Co. v. Interstate Distribution Inc. (In re Interstate Cigar Co. Inc.)*, Case No. 890-81248-478, 2002 Bankr. LEXIS 781, at *3-4 (Bankr. E.D.N.Y. July 26, 2002), ("the law which gives rise to the claim itself determines the applicable rate of prejudgment interest.").

Therefore, the Court exercises its discretion and grants the Plaintiffs prejudgment interest in accordance with 28 U.S.C. §1961(a), beginning on October 13, 2010 through the date of judgment, at the rate of .24%, representing the rate applicable on the day they filed the Complaint, compounded annually.

## VII. CONCLUSION AND ORDER

For all of the reasons set forth above, and it appearing that there is no genuine issue of material fact to be tried with respect to the Plaintiffs' Fourth Cause of Action in their Complaint, in accordance with which

**IT IS HEREBY ORDERED** that *Plaintiffs' [Partial] Motion for Summary Judgment*, Adv. ECF No. 52, is **GRANTED**, and

**IT IS FURTHER ORDERED** Judgment in favor of the Plaintiffs against the Defendant requiring the Defendant to pay to the Plaintiffs the sum of $210,000, plus interest from October 13, 2010 to date of judgment at the annual rate above specified, shall enter simultaneously herewith.

Dated: August 27, 2013                                BY THE COURT

Albert S. Dabrowski
**Chief United States Bankruptcy Judge**